IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:17CR424 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE CHRISTOPHER A. BOYKO |
| v. | ) | |
| | ) | |
| WISAM RIZK, | ) | SUPPLEMENTAL LOSS MEMORANDUM OF |
| | ) | THE UNITED STATES |
| Defendant. | ) | |

**I.     The Hearing Evidence Confirmed That The Entire $5.6 Million Contract Amount Is The Appropriate Loss Number Because Rizk Fraudulently Steered The IVHR Contract To ISTAR, An Entity In Which He Had A Significant Financial Interest, From Its Inception.**

The Court should find that the appropriate loss number is the entire $5.6 million that the

Clinic paid to ISTAR from Summer 2012 through Spring 2015.  The Clinic hired Rizk to solicit

outside bidders, recommend the contract awards, and manage on the Clinic's behalf the IVHR

software development project.  Rizk, on the Clinic's behalf, solicited and/or accepted bids on the

project in approximately January 2012.  (R. 51: Hearing Trans., PageID 576).  The hearing

evidence confirmed that, from the project's inception — Rizk fraudulently steered the IVHR and

related contracts to "ISTAR."  In fact, ISTAR turned out to be two different companies, both of

which Rizk always had a significant financial interest in.  Rizk represented to the Clinic that

ISTAR had significant prior experience working on similar software projects, and made it appear

to the Clinic that ISTAR was an independent third-party that he engaged in an arms-length

transaction.  Neither of these things, however, were true.

After Rizk spoke to him about the IVHR contract at the end of 2011, Rizk's longtime

college friend set up the initial, Dubai-based ISTAR company in January 2012.  (R. 51: Hearing

Trans., PageID 478-80, 506-07 & Gov't Exs. 1, 17).  Unbeknownst to the Clinic, the Clinic was

its first client.  By Rizk's own admission, the ISTAR principals had offered to pay him 23

percent of the IVHR contract amount if the contract was awarded to ISTAR, (R. 51: Hearing

Trans., PageID 473-76, 489), a decision in which Rizk played a large role.

The testimony of Special Agent Michael Sirohman and the approximately 19 exhibits that

the government introduced through him at the hearing show that, right away, in February 2012 –

well before ISTAR ever entered its first contract with the Clinic – Rizk took an active role in

establishing a virtual mailing address for the Dubai-based ISTAR in New York, and in

contracting with Jean Martin to supply people to actually perform the work, but remain disguised

as ISTAR.  In June 2012, about a month after ISTAR and the Clinic signed their first contract,

Rizk set up another ISTAR entity, this one a Delaware company that he wholly owned.  A few

weeks later, he had his brother-in-law set up a U.S. Bank account, which Rizk controlled, and

then directed every Clinic payment to his account.  He never informed the Clinic of the

company-swap he had engineered – despite an explicit nonassignment/no subcontracting clause

in the contract.  (*See, e.g.*, Gov't Exs. 6, ¶ 19 & 15,¶ 19).  No money ever went to the Dubai

company.  After Rizk had substituted his 100-percent owned ISTAR for the one in which he had

a 23-percent interest, Rizk caused the substitute company to enter into at least two additional

contacts with the Clinic, having a nominee sign the contracts to disguise Rizk's involvement and

never disclosing that this was a different company, much less one that he owned.

The testimony of IVHR project manager Devin Gaymon and IVHR quality assurance

manager Todd Rosenthal showed that Rizk was the primary contact with ISTAR (which was also

Rizk) throughout the project.  It also showed that ISTAR had several performance issues, which

Rizk refused to address – all because he surreptitiously received an extra $2,784,847 by inserting

himself into his employer's contract; he gave $468,967 of that amount to Gary Fingerhut to

ensure his ability to keep the scheme operating.  Rizk essentially doubled Jean Martin's charges

before submitting ISTAR's bills to the Clinic, and then kept the marked-up amount for himself.

He further added extra hours that Jean Martin had not worked to the bills and kept all of that

money himself.  As the Clinic representative explained in detail, Rizk's conduct violated the

Clinic's conflict-of-interest policies, and the Clinic never would have agreed to pay Rizk, as a

paid-Clinic-manager, more money to manage himself vis-à-vis ISTAR.   Moreover, despite more

than three years of work, ISTAR never delivered a functioning product to IVHR.[1]

The Court should thus find the entire $5.6 million that the Clinic paid to ISTAR as the

loss amount in this case.  Rizk owed the Clinic his loyalty and his honest services in connection

with the IVHR software development contracts.  Not only did Rizk instead double the price that

Jean Martin charged for software development services so that he would personally receive

financial benefits, but he also, through his fraud, completely undermined the Clinic's ability to

select and negotiate an arms-length deal with the actual service provider.  He also compromised

the Clinic's ability to then monitor whether the project was on track and proceeding in a

commercially reasonable manner.  These latter aspects of Rizk's conduct supports finding that

the loss here is the entire $5.6 million amount, not merely the $2.7 million that he took himself.

## II.    Responses To The Court's Specific Questions.

### A.    Loss Amount Numbers, Defense Concessions, And Legal Support

The various numbers that the parties previously submitted are as follows:

A.    $5.6 million is the entire amount that the Clinic paid ISTAR, from inception

---

[1]   According to Fingerhut, the IVHR business plan allotted $5 million, total, for software development.  IVHR paid ISTAR more than $5.6 million, but the primary project never got past the alpha-demo phase; it required significant additional money to do so.  (R. 51: Hearing Trans., PageID 431-33).

to end.  All of this money went to the ISTAR Delaware company's bank account, which Rizk controlled and owned through his nominee owner and brother-in-law, George Jeries.

B.     $2,784,847 is the entire amount of money that ISTAR/Rizk kept, after paying Jean Martin to perform work pretending to be ISTAR.  Of this amount, Rizk transferred $468,967 to Gary Fingerhut to remain silent about the scheme and sign off on payments and progress.

C-1.   $282,091.86 is the additional fake charges that Rizk billed to the Clinic for more than 7,100 hours of work that Rizk (as ISTAR) represented had been completed; in fact, Jean Martin never completed that work.  This number is based on the FBI's comparison of Jean Martin-to-ISTAR invoices with ISTAR-to-Clinic invoices, which are reflected in the chart that the government submitted with its initial memorandum regarding loss.  At the hearing, defense witness Richard Bender agreed that this (or a number very close to it) was the appropriate "fake hours" amount.  Bender did so after he learned that the Clinic had never paid any money to the Dubai company and that Jean Martin had never actually purchased the ISTAR company from Rizk (nor contracted with the Clinic).  (R. 51: Hearing Trans., PageID 576-77).

C-2.   $188,722.83 is the amount that Richard Bender originally calculated for the fake hours that Rizk submitted.  *See* (Bender Report, pp. 6-7).  He calculated this amount before the hearing; at the hearing, he learned, contrary to Rizk's prior misrepresentations to him, that Jean Martin had never taken over the Clinic contract and that ISTAR-as-Rizk continued to receive all payments.  **The parties agree that the Court should consider the C-1 amount, and that the C-2 amount is no longer valid.**

D.     $268,380.97 are all charges relating to the "Open OR" and "R-Calc" software projects that the U.S. ISTAR company signed contracts to provide.  Rizk, through his counsel, has agreed that the Court should consider these amounts as losses to the Clinic, for reasons previously disclosed to the Court.  **Rizk concedes that these amounts should apply, in addition to the C-1 amount.**

### 1.     Applicable Law

In this case, the parties agreed that the Court should apply Guideline Section 2B1.1 to Rizk's conduct.  *See* (R. 17:  Plea Agreement, ¶ 17.b.).  Under 2B1.1, loss is the greater of the actual loss or the intended loss.  U.S.S.G. § 2B1.1 Applic. N. 3(A).  "Actual loss" is the "reasonably foreseeable pecuniary harm" resulting from the offense, *id*., Applic. N. 3(A)(i), while "intended loss" is the "pecuniary harm that the defendant purposely sought to inflict."  *Id*.,

Applic. N. 3(A)(ii).   "Pecuniary harm," in turn, is "harm that is readily measurable in money."

*Id*., Applic. N. 3(A)(iii).   "Reasonably foreseeably pecuniary harm" is pecuniary harm "that the

defendant knew or, under the circumstances, reasonably should have known, as a potential result

of the offense."  *Id*., Applic. N. 3(A)(iv).

### 2.      $5.6 Million Loss

The foregoing Guideline 2B1.1 definitions support finding that the Clinic's actual loss is

the entire $5.6 million contract amount.  The Clinic paid Rizk a salary to manage what it

believed to be a contract entered into at arms-length.  Instead, Rizk was on both sides of this

deal:  he collected (1) his salary from the Clinic, paid to oversee and manage the project, and

(2) the $2.7 million "subcontractor upcharge" fee that ISTAR charged the Clinic purportedly to

oversee and manage the work of Jean Martin, a subcontractor of which the Clinic was not aware

and which the contracts expressly barred.  Don Sinko confirmed that, had the Clinic known

about this "upcharge," it would never have agreed to pay such a double "management" fee to

Rizk on both sides of the transaction.  Indeed, in other situations where a contractor discloses an

arrangement that would result in such a double fee, the Clinic has declined double payments.

Further, profiting from both sides of the contract, Rizk also had an incentive to increase

the submitted project charges as much as he could get away with.  He admits that he (as ISTAR)

submitted and collected on fake charges to the Clinic to the tune of $282,091.86.  While this

amount is logically incorporated within the $2.7 million that Rizk (as ISTAR) kept himself, it

nonetheless further reflects a plain actual loss to the Clinic.

The Clinic's actual losses also include the balance of money (approximately $2.8 million)

that Rizk (as ISTAR) paid to Jean Martin.  There are two reasons to include it.  First, the

government's evidence showed that Rizk intended to perpetrate this fraudulent scheme from the

start.  Through his fraud and disguised presence on both sides of the transaction, Rizk completely

undermined the Clinic's ability to select and negotiate an arms-length deal with the actual service

provider, as well as the Clinic's ability to then monitor whether the project was on track and

proceeding in a commercially reasonable manner.  Indeed, both Gaymon and Rosenthal testified

that ISTAR's progress was slow and "subpar," and that their complaints to Rizk about the same

fell on deaf ears.  (R. 51: Hearing Trans., PageID 428, 434-35, 454-456, 458-59).  Rosenthal

further testified that ISTAR was using too many off-shore personnel to design and test the

software, and that the Clinic could have hired onshore people who would almost certainly have

performed better, at a lower, overall cost.  Likewise, according to Rosenthal, the hourly rates

paid to Jean Martin's offshore staff was "too high," and ISTAR was billing too much relative to

the amount of work being completed.  Had he not fraudulently inserted his own personal-

profiteering interests into the contracting relationship and instead acted with the Clinic's interests

in mind, Rizk may have negotiated a better overall price for the Clinic – or engaged a

programming company that provided the required oversight and project management skills and

actually produced a workable design.  Given that actual loss incorporates "reasonably

foreseeably pecuniary harm," which includes monetary harm "that the defendant knew or, under

the circumstances, reasonably should have known, as a potential result of the offense," this Court

should deem payments to Jean Martin for subpar, inefficient work as actual losses to the Clinic.

Moreover, ISTAR's contract with the Clinic contained a "nonassignment" clause,

expressly prohibiting ISTAR from subcontracting the work it agreed to perform to a third-party

without the Clinic's advance written consent.  *See, e.g.*, Exs. 6 & 15 (Clinic / ISTAR Consulting

Services Agreement, ¶ 19).  This express contract provision, which Rizk blatantly circumvented,

provides additional support for finding that the Court should include in the loss amount all of

those amounts paid to Jean Martin since the Clinic never agreed to pay Jean Martin a dime.

### 3.     $2.7 Million Loss

At a minimum, even providing some type of credit against loss to Rizk because Jean Martin actually did perform work, the Court should still find that the loss amount is at least the $2.7 million that Rizk diverted to himself through this self-dealing scheme.   That amount can qualify either as the "intended loss" or, alternatively, as the gain.

*Intended loss.*  Rizk owed the Clinic both his loyalty and his best efforts to secure the best price possible for work on the project.  He was thus obligated to pass on the price that he negotiated with Jean Martin to the Clinic.  This is doubly so given that ISTAR was a sham company, with no employees, that did not provide any services – other than those "oversight" and management functions that the Clinic was already paying Rizk a salary perform.

Thus, assuming that all services that Jean Martin rendered were commercially reasonable – an assumption that witnesses disputed – at a minimum, Rizk intended to divert to himself from the Clinic the extra $2.7 million that he paid to himself on top of his Clinic salary.

*Gain.*  Given the difficulty of determining exactly which Jean Martin services were commercially reasonable, and which were undertaken due to Rizk's failure to manage the project, the Court could alternatively use Rizk's gain from his offense as a measure of loss.  *See* U.S.S.G. § 2B1.1, Applic. N. 3(B) ("The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined"). That amount is also $2.7 million

### B.     Authorizing Parties:  Progress and Payment Approvals

Rizk was the primary person at the Clinic who interacted with himself, as ISTAR, and with Jean Martin, ISTAR's unauthorized subcontractor.  While other persons, such as Rosenthal

and Gaymon, as well as Clinic doctors, knew about or were periodically made aware of the

project statuses, it was Rizk who signed off on project progress to initiate each associated

payment.  As Rosenthal testified, when he viewed the magnitude of the actual payments that

IVHR was making to ISTAR on a monthly basis he was "shocked," because the amounts were

greater than that justified by the progress being made and the amount of work being done.

(R. 51: Hearing Trans., PageID 457-59).

According to Gary Fingerhut, Fingerhut was the second-line/higher-level approver for all

ISTAR invoice payments.  He reviewed all invoice details, initialed the invoices, and then sent

them to the finance department.  Steven Glass, the Clinic's Chief Financial Officer and

Treasurer, approved all invoices over $50,000.  It is the government's understanding that Glass

did not perform a substantive project review in doing so, but instead relied primarily on the

representations of Fingerhut and Rizk.

### C.      Fair Market Value of Jean Martin's Services

Of the $5.6 million that the Clinic paid to ISTAR, ISTAR paid approximately $2.8

million of that to Jean Martin.  It is difficult, however, to determine the actual fair market value

of Jean Martin's services.  As Rosenthal explained, based on his experience, ISTAR (through

Rizk) engaged far more offshore developers than were reasonably needed for the IVHR projects,

and billed for more hours than they were working.  (R. 51: Hearing Trans., PageID 452, 454-56,

458).  There is no way to establish the percent of extra hours attributable to Rizk creating fake

hours, and the percent attributable to something Jean Martin did to fulfill the contract.

Further, the work that Jean Martin performed was "subpar" and of "poor" quality, (*id.*,

PageID 454, 456), they would miss a lot of "bugs," or report bugs that actually were not bugs,

(*id.*), and their work was always late and regularly had to be redone.  (*Id.*; *see also* R. 51:

8

Hearing Trans. (Gaymon), PageID 434-35).  Rosenthal opined to Rizk that, "for the price that

we're paying for these offshore people we could get a third or less people on shore that would do

a much better job."  (R. 51: Hearing Trans., PageID 456).  According to Rosenthal, pursuing

such an onshore-route would "cut the costs basically in half."  (*Id.*, PageID 457-58).

If the Court were to use Rosenthal's "one-half" estimate to make its own "reasonable

estimate of the loss," as Application note 3(C) requires, it would start with a fair market value of

approximately $1.4 million, but have to reduce that number by an unknown factor to adjust for

quality issues.[2]  While far from perfect, this is probably the best information from which the

Court could make a fair-market-value determination.  If the Court were to reduce the value by 30

percent to account for all of the problems that Rosenthal and Gaymon identified, the fair market

value would be approximately $1 million, and the corresponding loss amount from the Jean-

Martin-paid portion approximately $1.8 million.  If the Court disagrees with this or a similar

analysis, the government submits that it cannot reasonably estimate the fair market value for the

services that Jean Market did, in fact, provide.

**D.      Impact of Fingerhut's Plea On Loss Amount.**

Fingerhut's guilty plea does not directly affect the loss amount here.  Although he also

pled guilty to conspiring to commit wire fraud and honest services wire fraud in connection with

this scheme, in violation of 18 U.S.C. § 1349, in his case, the parties recommended to the Court

that it apply Guideline Section 2B4.1, rather than Guideline Section 2B1.1, because of the

particular nature of Fingerhut's criminal conduct, *i.e.*, taking commercial kickbacks that did not

involve government officials, which more closely resembling a fraud achieved through

---

[2]  While Rosenthal did indicate that, in his experience, offshore developers are paid $15/hour
and quality assurance workers $12/hour, (*id.*, PageID 446-47), he did not provide information
about the other positions Jean Martin billed to ISTAR.  Therefore, the Court cannot determine
fair market value simply by multiplying these rates by the number of hours Jean Martin reported.

kickbacks and bribery rather than a straight fraud.  The government cited cases and Guideline provisions supporting that application.

Here, the government believes, and the parties agreed, that Guideline Section 2B1.1 is the better provision to apply to Rizk.  This is because he not only paid commercial kickbacks to Fingerhut to perpetuate his scheme, but also more generally diverted an even greater amount of money to himself via a shell company that he fraudulently inserted into Clinic business transactions.  Unlike Fingerhut's situation, where the financial transactions were direct kickbacks (which Section 2B4.1 typically addresses), the financial transactions from which Rizk benefited directly are more akin to a traditional wire-fraud scheme covered by Section 2B1.1.

Fingerhut's plea is relevant only as a sentencing-disparity matter.  Under Section 2B4.1, the Court applied to Fingerhut a "loss" of $2.7 million because it was the "value of improper benefit conferred," *i.e.*, "the value of the action to be taken or effected in return for the bribe," which here, is the total amount of money diverted to Rizk, some of which he used to pay Fingerhut's kickbacks.  It would make little sense to apply a loss number lower than $2.7 million to Rizk, who was the more culpable of the two defendants in this case, and who personally retained $2.3 million of the diverted money, compared to the $468,967 that Fingerhut received.

Respectfully submitted,

Justin E. Herdman
United States Attorney

By:    s/ Rebecca Lutzko
Rebecca C. Lutzko (OH: 0069288)
Assistant United States Attorneys
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, OH 44113
(216) 622-3888
Rebecca.Lutzko@usdoj.gov

10

CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of June 2018, a copy of the foregoing Supplemental

Memorandum of the United States was filed.  Notice of this filing will be sent to all parties by

operation of the Court's electronic filing system.  All other parties will be served by regular U.S.

Mail.  Parties may access this filing through the Court's system.


/s/ Rebecca Lutzko
Rebecca Lutzko
Assistant U.S. Attorney