IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:17CR424 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| v. | ) | |
| | ) | |
| WISAM R. RIZK, | ) | |
| | ) | |
| Defendant. | ) | |

## SENTENCING MEMORANDUM ON BEHALF
## OF DEFENDANT WISAM R. RIZK

Defendant Wisam R. Rizk ("Mr. Rizk"), through undersigned counsel, hereby submits the following information regarding the offenses and factors that are relevant to this Court's determination of sentencing pursuant to 18 U.S.C. § 3553.  Mr. Rizk respectfully asks this Court to consider the following information in determining the appropriate sentence in this matter.

### I.       OVERVIEW

On November 16, 2018, Mr. Rizk pleaded guilty to offenses stemming from his time as a consultant and later as Chief Technology Officer for Interactive Visual Health Records ("IVHR"), a subsidiary of Cleveland Clinic Innovations ("Innovations").  Innovations was a department of the Cleveland Clinic Foundation ("Clinic").  Specifically, Mr. Rizk pleaded guilty to one count of Conspiracy to Commit Wire Fraud and Honest Services Wire Fraud, one count of Wire Fraud and Honest Services Wire Fraud, and one count of making a material False

{7983501: }

Statement.  Mr. Rizk has fully acknowledged his actions and has already started to provide restitution to the Clinic.  Furthermore, Mr. Rizk has agreed not to contest deportation from the United States, a punishment far more devastating to him and his family than any other punishment imaginable.

In considering an appropriate sentence for Mr. Rizk, we respectfully ask this Honorable Court to consider a number of factors, including the numerous letters submitted by friends and family members.  In these letters, Mr. Rizk is consistently described as a devoted family man who invariably puts the interest of others before his own.  These accounts also demonstrate the sacrifices and hardships Mr. Rizk has faced throughout his life, and reveal the man he truly is: a dedicated father, son, husband, and friend.

We also ask that this Honorable Court consider the actual loss amount incurred by the Clinic.  To assist in this regard, we have provided a detailed report by Mr. Richard Bender, President of Bender RBT Inc. and consultant with extensive knowledge of the area. (See Analysis of Financial Loss Incurred by the Cleveland Clinic attached hereto as Exhibit A.)  It is Mr. Bender's opinion that although Mr. Rizk hid his interest in iStar (USA) from the Clinic, the Clinic in fact received everything it paid for and that the only true loss was excessive billings totaling less than $200,000.  Other than that, Mr. Rizk's financial interest in iStar resulted in no loss whatsoever to the Clinic.

Furthermore, we ask this Honorable Court to consider the actual events that led to Mr. Rizk engaging in the conduct he did, as opposed to the government's initial belief and statements of Mr. Rizk's supervisor, Gary Fingerhut.  This information does not exonerate Mr. Rizk of the crimes he committed, but they do provide a more complete and accurate explanation of how we arrived where we are today.

## II.     BACKGROUND

### A.     Offenses Relating to iStar

Contrary to the government's initial belief that Mr. Rizk "masterminded" the idea of creating a shell company in Dubai from the very beginning to hide his financial interest, he did no such thing.  In fact, as confirmed in a letter from Mr. Ahmed Salahuddin to this Honorable Court, Mr. Rizk actually contacted Mr. Salahuddin in late 2011 to see if his company - Emirates Trading Agency Star (ETA) - would be interested in handling the contract with IVHR that is the subject of this case.  At the time, Mr. Salahuddin was a Director of ETA and his father was a partner and Managing Director of the company.  Mr. Salahuddin tasked ETA's IT division to handle the IVHR contract and it was ETA who set up a free zone company named iStarFZE to do so.  Mr. Rizk had no ownership in iStarFZE and held no control in the company.  It was only after iStarFZE started work on the contract and decided to vacate the agreement because the Clinic wanted the company to have a U.S. presence that Mr. Rizk decided to step into the shoes of iStarFZE.  Mr. Salahuddin stated in his letter that due to existing policies of ETA's parent company, they would not establish a bank account in the United States and therefore had to vacate the contract.

It was at this time that Mr. Rizk saw an opportunity to continue with the contract and also benefit himself financially.  ETA (iStarFZE) had already engaged the services of the India-based company Jean Martin to work on the project as a sub-contractor and Mr. Rizk determined that he would simply step into ETA's shoes as the primary contractor.  It was never Mr. Rizk's intent to provide inferior service to IVHR.  Mr. Rizk was concerned, however, that IVHR and the Clinic

would not permit him to be the primary contractor and would require him to find another contractor for the job.

As Mr. Salahuddin stated in his letter, Mr. Fingerhut requested "loans" from him and his company on more than one occasion.  Mr. Salahuddin did not comply with Mr. Fingerhut's requests for money, but did comply with Mr. Fingerhut's request to provide his son with an internship position in Dubai and India.  Mr. Rizk advised Mr. Salahuddin of his desire to take over the contract and needed to first discuss the matter with Mr. Fingerhut.  Mr. Rizk has maintained from the beginning of this investigation that Gary Fingerhut knew that Mr. Salahuddin's company withdrew from the contract early on and that Mr. Rizk formed a similarly named company in the United States to step into iStarFZE's contractual shoes and that Mr. Fingerhut requested monetary payments from Mr. Rizk.  This is consistent with Mr. Salahuddin's account in his letter to this Honorable Court.  As stated earlier, this in no way exonerates Mr. Rizk, but does provide the Court with a more accurate description of the underlying facts.

As Mr. Richard Bender advises in his report, it is not uncommon for vendors to use subcontractors in their businesses.  Both iStarFZE in Dubai and Mr. Rizk's company employed Jean Martin in India.  Insofar as potential loss amount to the Clinic, the project was closely monitored by Clinic personnel, who were satisfied with the progress of the work.  The software code submitted to Innovations passed all of Innovations' evaluations and actually exceeded expectations.  The Clinic received biweekly status reports and was well aware of the status of the project in real time.  Mr. Bender writes that if a client such as IVHR or the Clinic "decides not to deploy a system that was being developed on time and materials, it is unprecedented that they get

to essentially say 'I've changed my mind so give me all my money back and cover my lost opportunity which I believe I would have gained if the system was successful.'"

The fact that Mr. Rizk was the true owner of iStar at that time had no impact at all on the quality of the work product provided to IVHR and the Clinic.  Whether it was iStarFZE in Dubai or Mr. Rizk's company in the United States, the Clinic received the very same product.  Other than $188,722.83 that Mr. Bender determined was overbilled by Mr. Rizk, neither the Clinic nor the government can demonstrate any loss sustained by the Clinic due to Mr. Rizk's activities. The Clinic was satisfied with the work and the price it paid.

Moreover, the government's contention that a substantial part of Mr. Rizk's offense was committed outside the United States is not accurate.  Mr. Rizk's offense was simply withholding the fact that he had assumed the role of iStarFZE and that he paid monies to his supervisor to assist him.  It was not fraudulent conduct on the part of iStarFZE in Dubai or Mr. Rizk to use the services of Jean Martin in India.  To the contrary, it is quite common in the field of code writing. Nor was it a requirement under the contract that iStar inform IVHR or the Clinic of personnel it used.  As detailed in Mr. Bender's report, use of subcontractors in this area is commonplace. Whether Jean Martin was located in India or Indiana, the impact was the same.  Furthermore, Mr. Rizk's conduct did not rise to the level of sophisticated means under 2B1.1(b)(10).  Once he established iStar in the United States, the actions taken with IVHR and the Clinic were the same that would have occurred if iStarFZE in Dubai had remained as the prime contractor.

**B.**     **Statement of Acceptance of Responsibility by Mr. Rizk**

Mr. Rizk fully acknowledges that his actions in this matter were illegal and takes full responsibility for all he has done.  Mr. Rizk provides the following written statement to this Honorable Court in his own words:

"During my period as a consultant to the Cleveland Clinic, it was my responsibility to procure a development contract for a spin off company called IVHR.  I procured the contract for development services from an offshore entity named iStarFZE in early 2012.  Soon after, iStarFZE informed me that it no longer wished to continue the contract because the Clinic required vendors to have a U.S. presence and the company did not want to deal with U.S. tax issues. I saw an opportunity to make money by stepping into iStar's shoes and continuing to use the India-based subcontractor iStar had already engaged (Jean Martin).  I did not think about whether my actions were illegal and did not believe at the time that they were.  I was more concerned that the Clinic might require me to procure a new contractor, rather than allow me to handle it myself.

I advised my supervisor, Gary Fingerhut of my decision to set up another company in the U.S. with the same name and my reason for doing so.  Gary agreed and also asked me for a $25,000 loan.  I realized then that this was not truly a loan, but actually a payment to him to not raise any issues with the Clinic. That was the moment I should have gone to higher management and advised them of my involvement with the new iStar company, but failed to do so.  For that, I will always be remorseful.  I agreed to continue providing Gary money because it permitted me to continue receiving funds on the contract.  I knew that what I was doing was wrong and take full responsibly for my actions.  I am very sorry for the pain and distress that this has caused everyone, especially my family."

## C.  Personal History of Mr. Rizk

Mr. Rizk's young life was filled with turmoil and instability.  He was born in Lebanon in 1975, at the very start of the nation's civil war.  His family was part of an extraordinarily small group, known as the Palestinian Maronite Christians.  Thus, during the Lebanese Civil War, he and his family were outsiders at every turn as they did not belong at either the Muslim refugee camps, nor amongst Lebanese Christians.  In fact, at age five, Lebanese Christian militia invaded Mr. Rizk's home in Beirut, and nearly killed his father despite being Christian, because he was Palestinian.

At age six, Mr. Rizk's family successfully fled the violence of Lebanon and relocated to Vienna, Austria.  Unfortunately, it was also at this time that Mr. Rizk was sexually abused by a member of his family.  While the abuse lasted only three months, its effects have haunted Mr. Rizk throughout his life, as they do any abuse survivor.  Mr. Rizk has experienced anxiety,

violent reactions to particular stimuli, and embarrassing social issues as a result of the abuse he suffered as a child.

Further complicating his childhood was the racism and hatred he and his family experienced as Arabs in Austria.  It was the oppression experienced as a result of their cultural background that finally led the Rizk family to immigrate to the United States.  Despite everything, Mr. Rizk managed to overcome each obstacle placed in his way in order to be successful in his studies.  Mr. Rizk performed well in high school at the Vienna International School, earning special recognition for his extended essay project which placed 4th out of 4,000 international submissions.  It was at this time, now more than 25 years ago, that Mr. Rizk's family moved to the United States.

Upon arrival, Mr. Rizk enrolled at Cleveland State University.  While recognizing it as a great school, Mr. Rizk again felt the familiar pain of an outsider.  He gained 80 pounds, developed diabetes, and generally fell into a state of depression.  Here again, despite the hardships and constant lack of a sense of belonging, Mr. Rizk was able to persevere, get his life back on track, and successfully graduate from CSU.  He would then go on to fill various IT roles with increasing responsibility, culminating in his position as CTO for IVHR.  During that time, Mr. Rizk also tried his hand at entrepreneurship, only to have those ambitions derailed by less than savory business partners.  In fact, Mr. Rizk twice worked alongside the government, assisting the FBI in its investigation of those individuals.

Mr. Rizk's career success allowed him to care for his parents over the past dozen years as they no longer had the funds or capacity to provide for themselves.  In caring for them, Mr. Rizk even chose to walk away from a lucrative opportunity with PayPal in order to be with his father during the final year of his life.  His mother continues to live with him, and is dependent upon

his support for the basic necessities in her life.  Mr. Rizk has also allowed his father-in-law to live with them in order for him to be cared for as well.  These are just a few examples of the care and loyalty Mr. Rizk provides to his family

Mr. Rizk also lives with his wife of 15 years, Miriam, and his two beloved children: Jad, 11, and Marc, 6.  His wife is an American citizen, and his children are citizens by birth, only ever knowing life within the United States and English as a language.  Therefore, when Mr. Rizk is deported, he will also be permanently separated from his children.  This will be excruciating both for Mr. Rizk and the children who love him dearly.  No matter this Court's sentence, that level of pain is immeasurable and lifelong.

### D.     Testimonials Regarding Mr. Rizk's Character and Contributions to the Community

The numerous character reference letters submitted to this Court testify to Mr. Rizk's admirable work ethic; his long-standing and deep devotion to his family and friends; and his significant good works over a period of many years.  These individuals, many of whom have known Mr. Rizk for the duration of his life, provide their insights and experiences with Mr. Rizk to show his true nature and character.

Nearly all of the people who know Mr. Rizk most intimately recognize his devotion to his family.  Indeed, the fact that a dozen cousins alone wrote letters in support of Mr. Rizk evidence his commitment to and impact on his family.  His wife, Miriam Rizk, describes him as "a good man and a great husband and dad . . . a family man in general, someone who took care of his parents and is still taking care of his mom who lives with us and provides for her. He also welcomed my dad to live with us and treated him like his own father."  His mother, Samira Rizk, states that Mr. Rizk has "always been the one to take care of me" and "has always been there for

me to support and help me."  She further describes Mr. Rizk as "a loving son, loving husband and loving dad . . . a family guy."

Stephen Simko, Mr. Rizk's cousin, calls him "a family man and an amazing father and husband."  Another cousin, Raulla Simko, describes Mr. Rizk as "a man for whom family comes first.  He is a loving and caring father, husband, brother, and son."  His cousin Kamaal Shakkour wrote that Mr. Rizk "sacrificed for his family, work hard and long, but always kept a great enthusiasm."  Shade Rizk, another cousin, states that Mr. Rizk has "strong family values." His cousin Maria Rizk finds that Mr. Rizk's "dedication to his family is only superseded by his love and dedication to his wife Miriam, and his two children."  His cousin Rami Rizk recognizes that Mr. Rizk is "generous and open with me and many other people in the family."

His sister, Nasrin Rizk, describes him as "a dedicated and loving husband to his wife, and father to his two young children who love him tremendously."  His cousin, Naseem Rizk, finds him to be "a hardworking and dedicated family man."  Mr. Rizk's mother-in-law, Afaf Jeries, notes that Mr. Rizk's behavior and actions are "marked by his unconditional respect, love and help to every member of my family."  She further describes her son-in-law as "the perfect husband and the perfect father."

Rita Chaccour, a family friend, describes Mr. Rizk as a "loving father" and "caring husband" who is "[v]ery compassionate."  Another family friend, Anas Adhami, states that Mr. Rizk is "a family man, a genuine person, and the best friend a person could have."

Beyond being a good family man, Mr. Rizk is consistently described succinctly as a "good man" with high moral and ethical character.  His sister says of Mr. Rizk, "I couldn't ask for a kinder, bigger-hearted and more generous human being to be a part of my life."  His uncle Sami Shakkour describes him as a "good person . . . a good man" with "integrity."  His cousin

Rualla states that Mr. Rizk is "truly one of the best people I know."  His cousin Michael Shakkour describes Mr. Rizk as "the most optimistic person I have ever met . . . a pure and innocent person at heart."  His cousin Kamaal wrote that Mr. Rizk is "warm, welcoming, and above all he is kind" and "honestly a very good guy."  Yet another cousin, Sgt. Souheil Farres Sarrouh, describes Mr. Rizk as "one of the sweetest and kindest people you can meet."  Tarek Hanna Rizk, another cousin, states that Mr. Rizk "has always taught me to be a man of integrity and to do right by my family at all times," and that his "love, patience, and understanding helped me get back on my feet."

His cousin Sari Rizk describes Mr. Rizk as "an amazing friend, confidant, and individual who tries his best to lift those around him," and "teach responsibility and the value of hard work."  She also notes that Mr. Rizk "donates to many different charities" and "helped develop a mobile application for a friend's church" and further developed "a website for her growing at home bakery service free of charge."  Finally, Sari recalls Mr. Rizk helping her "personally deal with my depression."  His cousin Maria recognizes Mr. Rizk as "a man that loves, gives, and accepts responsibility for his errors."   His cousin Rami notes Mr. Rizk's "countless acts of selflessness" and acknowledges that he "taught me the meaning of family and how to take care of others."  Naseem Rizk describes him as "a good man, who made a mistake."  His brother, Nader Rizk states that Mr. Rizk has been "an honest and conscientious person throughout his life."  He knows Mr. Rizk as someone he could count on, who "always tried to do what is right by others."

His friend, George Kash, finds Mr. Rizk to be "an upright character . . . a great person, an intelligent and driven man, and by no means a danger to society."  His pastor, Monsignor Peter Karam, states that Mr. Rizk is a "good person and has always had morality in his actions,"

further finding that he "is a human being with a great heart and a decent person," in whom he has "witnessed only honesty, integrity, and a willingness to help others."  A business colleague and friend, Karim Hawi, points out the numerous gestures of generosity from Mr. Rizk and describes him as a "loving and caring person" who "stood beside me when I was in need."  He further states that Mr. Rizk has a "high level of integrity, openness and honesty about everything." Another colleague, Marcia Hales, speaks of Mr. Rizk's treatment of his employees, finding that he "cares about their welfare, making sure they work in a positive environment, and are properly compensated."  She further recognizes Mr. Rizk as a "brilliant, passionate, caring, committed, honest-to-a-fault and a good friend."  Another friend, Said Farhat, finds Mr. Rizk to be a "generous," "good man."  His friend Bassam Farhat describes Mr. Rizk as a man who is "generous and enjoys life.  He is a loving father" and "very hospitable host."

An employee of Mr. Rizk's business, Steven Englander, describes Mr. Rizk as a "thoughtful and dedicated leader" who "has always treated me fairly, dealt with my honestly, and has gone out of his way to be kind to me and my family."  He goes on to state that Mr. Rizk "has always acted in a transparent and open manner with me in business, and has never asked me to compromise my values in any way.  I find his leadership inspiring . . . [Mr. Rizk] is a genuinely good human being."  Another employee, Nicholas DeFeis, describes Mr. Rizk as a "family man" who "has conducted himself entirely ethically both professionally and personally" during the time he has worked with him.  His cousin, Thomas Branham, states that Mr. Rizk "is a light in the family, always smiling, joking and making everyone around him feel good . . . He truly is a good man."  His friend Anas states that Mr. Rizk is an "outstanding person on more than one level" with "outstanding moral, ethical and professional character."  A former colleague of Mr. Rizk at IVHR describes Mr. Rizk as "intelligent, has a big heart, and has good intentions."

Finally, his business colleague and friend discussed above, Ahmed Salahuddin, describes Mr. Rizk as "kind and generous . . . hard working but always puts his family first."

In addition to caring for his parents, Mr. Rizk's family and friends all describe him as a man who puts the needs of others before himself.  Mr. Rizk's uncle Sami describes him as someone who is "there for us" with a "focus on helping."  His cousin Stephen echoed those sentiments, stating that Mr. Rizk "has always been available to help me or my family in [any way] that he could."  His cousin Rualla described him as a man whose "door is always open to a friend or family member in need," something she experienced personally when he helped her "through troubles and doubts with his guidance, honesty, and acceptance."  His cousin Sgt. Sarrouh wrote that Mr. Rizk "helps anyone and everyone who asks for help."

His cousin Tarek writes of Mr. Rizk helping him "with the hardest times of my life and I have learned from him on how to handle difficult situations with grace and a positive outlook." He further describes Mr. Rizk as someone who "would give the shirt off his own back to those in need."  His cousin Shadi states that Mr. Rizk has "an open-door policy" and "was [always] there to talk to and provide support, no matter how busy he was."  His cousin Maria recognizes that Mr. Rizk "gives guidance and makes connections for people in our community, extends his time, energy, and home to whomever seeks it."  His brother states that Mr. Rizk's "generosity is palpable," with Mr. Rizk having "written websites for St. Maron's Church, and St. Elias Church . . . at no cost."  He goes on to state that Mr. Rizk "has done countless good deeds for his community."

Mr. Rizk's friend, Mr. Kash, states that Mr. Rizk was there for him when he "needed someone to help me through" a difficult time in his life, and that Mr. Rizk "made it a point to be there and offer time."  His colleague Ms. Hales states that Mr. Rizk "puts everyone ahead of

himself."  Family friend Ms. Chaccour states that "the norm for him is to put others first," and that "whenever and whatever the circumstances are you will find him there for you."  His employee Mr. DeFeis describes Mr. Rizk as someone who "is very involved with his neighbors and community."  His cousin Thomas states that anytime someone is in need, Mr. Rizk "is there no matter the time no matter the place."  His friend Anas states that Mr. Rizk "always took the time to help any relative in need of help."

Many also recognized Mr. Rizk's taking responsibility for his actions, contrition, and efforts to learn from his mistakes.  His wife provides that Mr. Rizk "always wanted to take full responsibility," and that he "is sorry for what he did and regrets the bad decisions he made." Similarly, his mother states that Mr. Rizk "is very sorry for the mistakes" he made.  His cousin Tarek recalled that Mr. Rizk "has spoken to me immensely on this topic and has held back tears in remorse for what has happened."  His cousin Sari states that Mr. Rizk "has shown remorse and a contrite demeanor upon reflection of his actions and has learned many lessons as a result."  Mr. Kash recognized that Mr. Rizk has "expressed deep sense of remorse in making such a serious mistake."  Ms. Chaccour states that "not a day passes by he doesn't feel sorry by trying to be a better person."

Finally, those who have known Mr. Rizk personally and professionally over the course of his entire life, describe the actions that are the basis of this case as completely out of character. His mother states that Mr. Rizk "does not intend harm nor does he have an ill bone in his body." His cousin Stephen states that he was shocked to learn of Mr. Rizk's charges, as "this is not the person that I know."  His cousin Sari states that the charges are "completely at odds with what the behavior and teachings [Mr. Rizk] has taught his children."  His cousin Maria finds that "I know this is not who he is."  His cousin Naseem states that the charges are "atypical of the man I

grew to know."  His mother-in-law asked if she "could believe that [Mr. Rizk's] involvement in this offence is consistent with [Mr. Rizk's] character?  No, I couldn't."  His colleague and friend Karim states that "this is not who he is!"  An employee, Mr. DeFeis, finds that "his involvement with this offense is completely inconsistent with what I have seen, heard and experienced."  His cousin Thomas writes "this offense is not the man I know [Mr. Rizk] to be."

The chorus from Mr. Rizk's family, friends, and colleagues is resounding: Mr. Rizk is a good, family man who has always put others first and tried to do and teach what is right. While Mr. Rizk acknowledges that what he did is wrong, those who have known him his entire life, both personally and professionally, recognize that this was but aberrant error, and not indicative of an otherwise genuinely good person.

## III.    LAW AND ARGUMENT

### A.    Applicable Sentencing Law

In the wake of the Supreme Court's decision in *United States v. Booker,* 543 U.S. 220 (2005), a district court shall impose a sentence that is "sufficient but not greater than necessary" to achieve the purposes of sentencing set forth in 18 U.S.C. 3553(a)(2).  *See United States v. Foreman,* 436 F.3d 638, 644 n.1 (6th Cir. 2006) ("[A] district court's job is not to impose a 'reasonable' sentence.  Rather, a district court's mandate is to impose 'a sentence sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2)"). The Sixth Circuit has recognized that "the sentencing court must make an individualized assessment of the appropriate sentence based on the facts presented" and "the unique circumstances of each case." *United States v. Herrara-Zuniga,* 571 F.3d 568, 585 (6th Cir. 2009).

In *Gall v.* United *States,* 552 U.S. 38, 47 (2007), the Supreme Court rejected both "an appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the

Guidelines range" and "the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." Rather, district courts should begin by using the Guidelines range as a "starting point" and not "presume that the Guidelines range is reasonable"; a court must then make "an individualized assessment of the facts presented." *Gall,* 552 U.S. at 39; *see also United States v. Grossman,* 513 F.3d 592, 596 (6th Cir. 2008) ("*Gall* shows that the sentencing process involves an exercise in judgment, not a mathematical proof …."); *United States v. Bass,* 320 Fed. App'x 350, 355 (6th Cir. 2009) ("The court may not presume the guideline range is reasonable; rather it must make a fact-based individual assessment.")

The ABA standard similarly advises sentencing courts to impose "***the minimum sanction*** that is consistent with the gravity of the offense, the culpability of the offender, the offender's criminal history, and the personal characteristics of an individual offender."[1] As the Sixth Circuit has recognized, "one of the overarching purposes of the Sentencing Guidelines as set forth in an introductory Policy Statement" is to "achieve 'proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of differing severity.'" *United States v. Farrow,* 198 F.3d 179, 193 (quoting U.S.S.G. Ch. 1, Pt. A, at 2.)

### B. Guideline Calculations

The Plea Agreement provides for a Base Offense Level of 7 pursuant to U.S.S.G. § 2B1.1(a)(1) (Counts 1 and 21). The government asserts that the Court should add an enhancement of between 16 and 18 levels based on the applicable loss amount pursuant to USSG § 2B1.1(b)(1)(I) and (J), as well as a two-level enhancement due to a substantial part of Mr.

---

[1] American Bar Association Criminal Justice Standards, Sentencing Standard 18.6.1(a) (2014) (emphasis added), *available at* http://www.americanbar.org/publications/criminal_justice_section_archive/crimjust_standards_sentencing_blk.html #6.1.

Rizk's scheme being committed outside the United States and/or involving sophisticated means, pursuant to USSG § 2B1.1(b)(10).  However, as set forth above and detailed in Mr. Bender's attached report, the actual loss was less than $200,000, and therefore a 10-level enhancement is appropriate. USSG § 2B1.1(b)(1)(F).  Furthermore, it is Mr. Rizk's position that a substantial portion of the fraud did not occur outside the United States, nor was the sophistication of the fraud anything beyond garden-variety.  The parties have also agreed that two-level enhancements apply to both (1) Mr. Rizk's role as an organizer, leader, manager, or supervisor in the criminal activity, and (2) his plea to obstruction by false statement.  USSG § 3B1.1(c) and USSG § 3C1.1, App Note (4)(G) & (8).   The Plea Agreement further anticipates a three-level downward reduction for acceptance of responsibility (USSG § 2B1.1(b)), plus an additional two level reduction for Mr. Rizk's agreement not to contest deportation/removal (USSG § 5K2.0).  As a result, Mr. Rizk's Total Offense Level is between 16 and 28, depending on the Court's resolution of the parties' disagreements, before any departures or variances.  The Presentence Investigative Report ("PSR") found the total offense level to be 26.

The Plea Agreement provides:

> [T]he parties agree to recommend that the Court impose a sentence within the range and of the kind specified pursuant to the advisory Sentencing Guidelines in accordance with the computations and stipulations set forth below . . . [N]either party will recommend or suggest in any way that a departure or variance from the associated Guideline range is appropriate, either regarding the sentencing range or regarding the kind of sentence.

(Plea Agreement PARA 14.)  Significantly, however, the Plea Agreement states that "***the Court alone will decide the advisory guideline range under the Sentencing Guidelines, whether there is any basis to depart from that range or impose a sentence outside the advisory guideline range, and what sentence to impose.***"  (Plea Agreement PARA 15) (Emphasis added).

Counts 1, 21, and 29 are grouped for guideline calculation purposes.  USSC § 3D1.2(c).
The sentencing guideline range here for a total offense level between 18 and 28 on Counts 1, 21,
and 29 ranges from 27-33 months to 78-97 months.

### C.    Application of Sentencing Factors

In determining Mr. Rizk's sentence, the Court must apply the factors set forth in 18
U.S.C. § 3553(a).  The § 3553(a) factors are set forth below and applied to Mr. Rizk and the
offenses at issue.

### 1.    The Nature and Circumstances of the Offense and History and Characteristics of Mr. Rizk (§ 3553(a)(1))

Mr. Rizk pleaded guilty to 18 U.S.C. § 1349 (conspiracy to commit wire fraud and honest
services wire fraud), 18 U.S.C. §§ 1343 and 1346 (wire fraud and honest services wire fraud),
and 18 U.S.C. § 1001(a)(2)&(3) (false statement and false document), as charged in Counts 1,
21, and 29 of the Indictment.

Pursuant to 18 U.S.C. § 3559(a)(4), a violation of 18 U.S.C. § 1343, 1346, and 1349 are
class C felonies and 18 U.S.C. § 1001(a)(2)&(3) is a class D felony.  Unlike Class A and B
felonies, incarceration is not mandatory for Class C or Class D felonies.  See 18 U.S.C. §
3561(a)(1).  This provides a strong inference of Congressional intent that not every Class C or
Class D offender should receive a sentence of incarceration.  It allows this Court to exercise its
substantial discretion under *Gall* to impose a sentence that includes the full range of sentencing
options.

Mr. Rizk has accepted responsibility for his actions and acknowledges that punishment,
including the possibility of incarceration as set forth in his plea agreement with the government,
is appropriate.  Although Mr. Rizk has agreed not to argue for a sentence outside the applicable
guideline range, this Honorable Court is authorized to consider his personal history and

characteristics to determine whether, particularly in light of his deportation from the United States, a variance is justified.

> **2.      Sentencing Must Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment (§ 3553(a)(2)(A))**

Mr. Rizk's sentence should send the proper message that this type of conduct will be punished appropriately, but not excessively.   Respect for the law is undermined both by sentences that are too short and sentences that are too long.  Mr. Rizk has no criminal history and other than this one instance, has shown himself to be an upstanding member of his community.

It is significant note that the offenses pled to are non-violent in nature.  Indeed, the Sixth Circuit has affirmed a white collar defendant's sentence of one day of imprisonment, five years of supervised release with 24 months of home confinement, and $250,000 fine --- a sentence that was well below the applicable guideline range of 57 to 71 months.  *See United States v. Musgrave,* -- Fed. App'x --, 2016 WL 2343025, at *4 (6th Cir. May 4, 2016) (rejecting the government's argument that the sentence was substantively unreasonable and holding it was not based on the impermissible consideration of socioeconomic status and did not fail to promote general deterrence); *see also United States v. Cernik*, No. 07–20215, 2008 WL 2940854, at *9 (E.D. Mich. July 25, 2008) (imposing a sentence of 60-month probation and holding "a term of 46 to 57 months is greater than necessary to reflect the seriousness of the offense").

Regardless of this Court's sentence, Mr. Rizk has already been and will continue to be punished for his offense for life.  Because he has agreed not to contest deportation, he will no longer be able to be with his wife and children in the United States.  He will not be able to be by his mother's side when she passes away.   He will have lost everyone he loves and everything he built over the past 25 years in the United States.  There can be no greater punishment, and those

factors reflect the seriousness of the offenses and promotes respect for the law.  Any attempt to diminish this factor as just another consequence of a person's actions ignores reality and the fact that innocent lives will be irrevocably impacted as a result of this matter.

It is important to emphasize that Mr. Rizk's actions in this matter are entirely out of character.  As described in the letters to the Court outlined above, the actions which led to Mr. Rizk's plea are not those of the man they know.  They further show that Mr. Rizk has accepted responsibility for his deeds, and shown to the community the tragic repercussions of such actions.

### 3.      General and Specific Deterrence (§ 3553(a)(2)(B) & (C))

Mr. Rizk has already lost the life that he built and knows that his actions have caused his family untold suffering.  Any length of time incarcerated pales in comparison to the lifetime bar of being with his family in the country he loves.  This alone will serve as a cautionary tale to anyone who considers engagement in similar conduct.

This sentencing factor incorporates the concept of direct deterrence; that is, the need to prevent future crimes by Mr. Rizk.  The Court should give this factor very little weight.  Mr. Rizk will immediately be deported upon the conclusion of any term of incarceration, and therefore runs absolutely no risk of recidivism in the United States.  Further, Mr. Rizk wants only to return to work in his future country so that he can provide for his wife, children, and elderly mother, who are unable to provide for themselves and will suffer tremendously while he is unable to earn a living.

### 4.      Provide Education, Training and Care (§ 3553(a)(2)(D))

Mr. Rizk has type II diabetes, chronic back pain, a chest nodule, an over active thyroid, and is in need of jaw surgery.  He takes four different medications daily for his ailments,

including Metformin, Tradjenta, and Fraxiga for his diabetes, and Levothyroxine and Vitamin D for his thyroid issues.  We respectfully request that the court take Mr. Rizk's medical conditions into account in its sentence.  *See, e.g.*, *Rita v. United States*, 551 U.S. 338, 364-65 (2007) (Stevens, J., concurring) ("Matters such as … medical conditions … are not ordinarily considered under the Guidelines [but are] matters that § 3553(a) authorizes the sentencing judge to consider.").

### 5.    Kinds of Sentences Available (§ 3553(a)(4))

Mr. Rizk's offense falls within Zone D of the Sentencing Table. U.S.S.G. 5C1.1(f) contemplates a Zone D offense being satisfied through imprisonment.  The Plea Agreement provides "the parties agree to recommend that the Court impose a sentence within the range and of the kind specified pursuant to the advisory Sentencing Guidelines in accordance with the computations and stipulations set forth below . . . [N]either party will recommend or suggest in any way that a departure or variance from the associated Guideline range is appropriate, either regarding the sentencing range or regarding the kind of sentence."  (Plea Agreement PARA 14.)

Mr. Rizk's Plea Agreement, however, states that "the recommendations of the parties will not be binding upon the Court, that the Court alone will decide the advisory guideline range under the Sentencing Guidelines, whether there is any basis to depart from that range or impose a sentence outside the advisory guideline range, and what sentence to impose."  (*Id.* PARA 15) (emphasis added).  This Court can therefore impose any sentence it believes appropriate under the facts and circumstances of this case and has considerable discretion to select from a wide range of sentencing options.  *See* U.S.S.G. 5C1.1.

### 6.      Avoid Sentencing Disparities (§ 3553 (a)(6))

In weighing potential sentencing disparities, this Court should look beyond sentences imposed within this district and consider how sentences have been imposed nationwide in similar cases.  *See United States v. Frazier,* No. 12-3887, 2013 WL 6224032, at *7 (6ᵗʰ Cir. Dec. 2, 2013) ("It is a national disparity, not a disparity between particular defendants that must be avoided.").  The sentencing data made available by the United States Sentencing Commission is particularly helpful to determine nationwide sentencing norms and averages in fraud cases.  *See, e.g., United States v. Smith,* No. 1:06-CR-00394, 2009 WL 2497174, at *5 n.1 (N.D. Ohio Feb. 2, 2009) ("[T]he court finds the statistics to be helpful in providing a rough sketch or sentencing norms and averages.")

For the Third Quarter of Fiscal Year 2018 (i.e., October 1, 2017 through June 30, 2018), the Commission reported that there were 4,089 fraud offenses. (*See* United States Sentencing Commission Quarterly Data Report, 3rd Quarter Release, Preliminary Fiscal Year 2018 Data Through June 30, 2018, "USSG 2018 Fourth Quarterly Data Report," Table 1). Of these, 76.0% received a sentence consisting solely of imprisonment, and the median length of imprisonment was 17 months.  (*See id.* at Table 6, 7.)  Significantly, 18.6% of fraud offense defendants received probation.  (*Id.* at Table 7.)  Of these cases, a full 21.2% were sentenced below the sentencing range where the government did not sponsor a below-range sentence.  (*Id.* at Table 10.)  ***All told, in 2,309 fraud offense cases (57%), the sentence imposed was below the applicable Guideline range.***  *Id.* This data shows show that numerous federal courts have imposed alternative sentences using their post-*Booker* discretion, particularly in the context of fraud offenses.

### 7.      Restitution to Victims of Offense (§ 3553(a)(7))

Ms. Rizk does not dispute that restitution is owed in this case.  However, Mr. Rizk disputes the amount of restitution that is owed.  The government asserts that the loss to the Clinic totals $2,784,847.  However, as set forth above, the Loss Analysis calculated by Mr. Bender found the Clinic's verifiable loss to be only $188,722.83.   We respectfully request that the Court consider the Loss Analysis in determining appropriate restitution.

### 8.      Consideration of Family Circumstances

The Sixth Circuit Court of Appeals has recognized that extraordinary family circumstances can be considered in fashioning the appropriate sentence. *U.S. v. Husein*, 478 F.3d 318, 326–29 (6th Cir. 2007); *see also U.S. v. Gorsuch*, 404 F.3d 543, 548 (1st Cir. 2005).

Mr. Rizk respectfully submits that the totality of the circumstances in this case warrants a sentence that, at the very least, falls at the lowest end of the applicable guideline range.  Mr. Rizk's family will lose their home if he is unable to work and support them for a substantial period of time.   In addition, his elderly mother is likely to require public assistance in that scenario as she is unable to provide for herself.  Courts have recognized that sentencing decisions may consider whether a defendant's family will be forced to accept public assistance.  *See, e.g.*, *Id*. at 327.

Moreover, the harm to the Rizk family—and in particular, to Mr. Rizk's children—is far greater than that which might result under ordinary circumstances.  Mr. Rizk is already being permanently taken away from his children as a result of his deportation.   A lengthy prison sentence will also force those children to leave their current school, friends, and the only community they have known.

## IV.    <u>**CONCLUSION**</u>

For all the reasons set forth above, Mr. Rizk respectfully asks this Court to impose a sentence that is appropriate under the circumstances.

Respectfully submitted,

*/s/ Richard H. Blake*
RICHARD H. BLAKE (0083374)
**MᴄDᴏɴᴀʟᴅ Hᴏᴘᴋɪɴs LLC**
600 Superior Avenue, East, Suite 2100
Cleveland, OH  44114
Telephone:  (216) 348-5400
Facsimile:  (216) 348-5474
E-mail: rblake@mcdonaldhopkins.com

*Counsel for Defendant Wisam R. Rizk*

{7983501: }                                   23

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on September 9, 2019, a copy of the foregoing SENTENCING MEMORANDUM ON BEHALF OF DEFENDANT WISAM R. RIZK was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  Parties may access this filing through the Court's ECF system.

*/s/ Richard H. Blake*
RICHARD H. BLAKE (0083374)
MᴄDᴏɴᴀʟᴅ Hᴏᴘᴋɪɴs LLC