IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:17CR424 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE CHRISTOPHER A. BOYKO |
| v. | ) | |
| | ) | |
| WISAM RIZK, | ) | <u>FINAL SENTENCING MEMORANDUM OF</u> |
| | ) | <u>THE UNITED STATES</u> |
| Defendant. | ) | |
| | ) | |

## I.  Introduction

The parties have entered into a written plea agreement and have previously submitted briefing in connection with sentencing in this case that, together, details Defendant Wisam Rizk's criminal conduct in this case, wherein Rizk, along with his coconspirator Gary Fingerhut, engaged in a scheme to defraud their employer, the Cleveland Clinic Foundation ("the Clinic"), and told lies to cover it up.  Further, the Court took witness testimony during hearings that it held in connection with its determining the loss amount.  The Court recently summarized the facts of this case in its opinion explaining its grounds for determining that $2,784,847 is the appropriate loss amount in this case.  (R. 57: Order, PageID 630-36).  Accordingly, rather than reiterate those facts yet again here, the government will simply apply them in addressing the appropriate Guidelines calculation, including the one disputed Guidelines enhancement that remains, and in addressing its recommended application of the Section 3553(a) factors here.

Ultimately, the government recommends that the Court find, consistent with Presentence Investigation Report, (R. 41: Sealed PSR, PageID 184-85), that Rizk's Total Offense Level is a Level 26, after credit for acceptance of responsibility.  In accordance with the plea agreement and Rizk's agreement to judicial removal from the United States, the government intends to ask that the Court depart downward from that Guidelines calculation by two levels, under Guideline Section 5K2.0, (R. 37: Plea Agreement, PageID 125-26), resulting in a final, applicable Guidelines Level of 24.  Under Section 3553(a), the government asks that the Court impose a sentence at the mid-point within the applicable Guidelines range, which at a Criminal History Category I recommends 51-to-63 months' imprisonment.  The government further requests that the Court impose restitution in the amount of $2,784,847, joint and several with the restitution owed by Gary Fingerhut, payable to the Cleveland Clinic Foundation.  Finally, the government requests that, upon submission of proof by Jean Martin, Inc., demonstrating a loss caused to it by Rizk collecting amounts from the Clinic and then failing to pay to Jean Martin the discounted price that it charged ISTAR to perform work on the IVHR contracts, the Court impose an additional restitution obligation on Rizk in the established amount.

I.    **Application of Guidelines Provisions and Guidelines Calculation.**

The government believes that the following Guidelines provisions apply, and that the Court should apply the same in this case.  The government notes that its calculation is consistent with that set forth in the final PSR.

| Title 18 U.S.C. § 1349: Conspiracy to Commit Wire Fraud & Honest Services Wire Fraud; AND Title 18 U.S.C. § 1001(a)(2)&(a)(3): Obstruction (False Statement/Document) | | |
|---|---|---|
| Base offense level | 7 | § 2B1.1(a) |
| Loss amount (between $1,500,000 and $3,500,000) | +16 | § 2B1.1(b)(1)(I) |
| Offense conduct outside the United States AND/OR Sophisticated means | +2 | § 2B1.1(b)(10)(B) & (C) |
| Role:  organizer/leader/manager/supervisor | +2 | § 3B1.1(c) |
| Obstruction of Justice – guilty plea to count enhancement | +2 | § 3C1.1 & Applic. n.8; § 3D1.2(c) |
| **Subtotal** | **29** | |
| Acceptance of Responsibility | -3 | § 3E1.1(a) & (b) |
| **TOTAL before Departure** | **26** | |
| Downward Departure | -2 | § 5K2.0; Plea Agreement, ¶¶ 19-20 |
| **TOTAL after Departure** | **24** | |
| | | |

The parties have agreed to recommend a sentence within the Guidelines range, as determined by the Court.  (R. 37: Plea Agreement, ¶¶ 14, 17.e., PageID 121, 123).  They disagree, however, about whether the Court should apply an enhancement under USSG § 2B1.1(b)(10).  Although Rizk objects to the same, it is the government's position that the Court should apply this enhancement.

> a.    *USSG § 2B1.1(b)(10)(B)&(C):  Conduct Substantially Outside USA / Sophisticated Means Enhancement*

Consistent with the PSR, the government believes that the two-level enhancement under USSG § 2B1.1(b)(10) applies to Rizk's conduct for two separate and independent reasons.  First, a substantial part of Rizk's fraudulent scheme was committed outside of the United States.

Second, Rizk's crime involved sophisticated means, and Rizk intentionally engaged in or caused the conduct constituting sophisticated means.  *See* USSG § 2B1.1(b)(10)(B)&(C).

Section 2B1.1(b)(10)(B) provides for a two-level enhancement when a substantial part of a fraudulent scheme is committed from outside the United States.  Here, Rizk caused ISTAR to use Jean Martin, a company located primarily in India, to submit to IVHR software coding / design work for the project, which ISTAR passed off as its own, to perpetuate the fraud.  Rizk, at least once accompanied by Fingerhut, travelled to those overseas facilities during the course of the fraudulent scheme.  As the testimony at the loss hearing reflected, it was by using an off-shore developer such as Jean Martin, whose employees commanded far lower salaries than would comparable employees of United-States-based companies, that Rizk (through ISTAR) was able to both commit this fraudulent scheme and increase the magnitude of his profits from it.

Further, Section 2B1.1(b)(10)(C) provides for an alternative two-level enhancement when the offense involves sophisticated means, such as the use of shell companies, like ISTAR, or other particularly intricate offense conduct to execute or conceal an offense.  U.S.S.G. § 2B1.1(b)(10)(C) & Applic. n.9.  As the application note explains,

> For purposes of subsection (b)(1)(C), "sophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense.  For example, in a telemarketing scheme, locating the main office of the scheme in on jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means.  Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

(*Id.*).  Here, Rizk defrauded the Clinic by directing to himself software-design contracts for which the Clinic paid him, handsomely, to solicit outside bidders, recommend the contract awards, and manage on the Clinic's behalf.  He did so through ISTAR, a pass-through entity that

he created, with disguised ownership, that provided no independent services.  He caused ISTAR to establish a mailing address, but not actual physical presence, in New York, New York, to create the false impression that it had a place of business located in the United States – which was important to the Clinic in selecting a contractor.  He also recruited his brother-in-law, who resided in California, to set up a bank account for ISTAR through a California bank, and then caused all Clinic payments to be made there, which funds Rizk then accessed and directed use of remotely from Ohio.  Rizk further established an internet website and email addresses to create the false impression that ISTAR was an operational business entity, when in fact it was only a shell.

In short, multiple aspects of Rizk's conduct readily satisfy multiple grounds for applying the Section 2B1.1(b)(10) enhancement.  Accordingly, the Court should include it in its Guidelines calculation.

**II.**     **Sentence to Be Imposed in This Case.**

    **A.**     **Applicable Law Regarding Sentencing.**

As the Court is well aware, the decision of the United States Supreme Court in *United States v. Booker*, 125 S. Ct. 738 (2005), rendered the Sentencing Guidelines advisory for all criminal cases, and gave district courts enhanced discretion in the sentencing of criminal defendants.  *United States v. Jackson*, 408 F.3d 301, 304 (6th Cir. 2005).

Nonetheless, to secure nationwide consistency, "the [Sentencing] Guidelines should be the starting point and the initial benchmark."  *United States v. Gall*, 128 S.Ct. 586, 596-97 (2007); *United States v. Lalonde*, 509 F.3d 750, 763 (6th Cir. 2007).  "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Id.* (citing *United States v. Rita*, 127 S.Ct. 2456, 2465 (2007)) (observing that Congress mandated

that the United States Sentencing Commission write sentencing guidelines that would carry out the objectives of 18 U.S.C. §3553(a)).  *See* 28 U.S.C. § 991(b).  Once the Guidelines have been considered, the court should, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, consider all the § 3553(a) factors and "make an individualized assessment based on the facts presented." *Gall*, 128 S.Ct. at 596-97.

In particular, after making the Guideline calculation, a sentencing judge is to consider the factors outlined in Title 18, United States Code, Section 3553(a)(1):

      (i)      the nature and circumstances of the offense and the history and characteristics of the defendant;

      (ii)     the four legitimate purposes of sentencing (described below);

      (iii)    the kinds of sentences available;

      (iv)    the Guidelines range itself;

      (v)     any relevant policy statement by the Sentencing Commission;

      (vi)    the need to avoid unwarranted sentence disparities among defendants; and

      (vii)   the need to provide restitution to any victims.

18 U.S.C. § 3553(a)(1)-(7).

Section 3553(a)(2) directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes of sentencing, which are as follows:

      (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

      (B)    to afford adequate deterrence to criminal conduct;

      (C)    to protect the public from future crimes of the defendant; and

      (D)    to provide the defendant with needed training, medical care, or other correctional treatment in the most effective manner.

6

18 U.S.C. § 3553(a)(2)(A)-(D).

The Sixth Circuit Court of Appeals requires that a district court provide a reasonable explanation of its application of the sentencing factors set forth in Title 18, Section 3553 of the United States Code in imposing sentence. In *United States v. Blackwell*, 459 F.3d at 739, 773 (6th Cir. 2006), the Sixth Circuit announced:

> The job of the district court is to impose "'a sentence sufficient, but not greater than necessary, to comply with the purposes' of section 3553(a)." In reaching a sentence that complies with the purposes of § 3553(a), the district court must consider the Sentencing Guidelines range and all relevant § 3553 factors. While a district court need not explicitly reference § 3553 or recite a list of factors, it must provide a reasoned explanation for its choice of sentence and its explanation must be sufficiently thorough to permit meaningful appellate review. . . . This Court will only uphold a sentence if it is reasonable. Reasonableness contains two facets: substantive and procedural. In reviewing for reasonableness, the Court employs a presumption for substantive reasonableness.

(Citations omitted.) *Id.* The Sixth Circuit has also opined that, "while a district court need not engage in a 'ritualistic incantation' of the § 3553(a) factors, its reasoning must be 'sufficiently detailed to reflect considerations listed in § 3553(a) and to allow for meaningful appellate review." *United States v. Tanner*, 2010 WL 2545589, No. 09-5177, (6th Cir. June 11, 2010) (*quoting United States v. Bolds*, 511 F.3d 568, 581 and *United States v. Mayberry*, 540 F.3d 506, 518 (6th Cir. 2008)). Therefore, a district court must impose a reasonable sentence while expressing enough of its rationale to permit an appellate court to understand the basis for the sentence imposed.

At sentencing, the district court "may accept any undisputed portion of the presentence report as a finding of fact." Fed. R. Crim. P. 32(i)(3)(A); *United States v. Carter*, 355 F. 3d 920 (6th Cir. 2004) ("the district court is allowed to accept as true all factual allegations in a pre-

sentence report to which the defendant does not object") (quoting *United States v. Levy*, 250 F.3d 1015, 1018 (6th Cir. 2001)); *see also*, *United States v. Duckro*, 466 F. 3d 438, 449-450 (6th Cir. 2006) (finding district court's acceptance of the uncontested facts from the pre-sentence report was appropriate).  Further, "the sentencing court subjects the defendant's sentence to the thorough adversarial testing contemplated by federal sentencing procedure."  *Rita*, 127 S.Ct at 2465; *see also United States v. Liou*, 491 F. 3d 334, 338 (6th Cir. 2007) (sentencing judge should satisfy the procedural requirement of setting forth enough to satisfy an appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own decision making authority).

**B.      The Court Should Sentence Rizk in the Middle of the Applicable Range.**

Based on the Section 3553(a) factors, it is the United States' position that this Court should sentence Defendant Rizk to a term of imprisonment in the middle of the advisory Guideline range for Level 24, Criminal History Category I.  The United States anticipates that will be a sentence in the middle of a 51-to-63 month range.

In particular, the nature and circumstances of the offense and Rizk's history and characteristics counsel toward a sentence at the high-end of the range.  Rizk held a high-level, well-compensated, position at the Clinic, earning a significant, six-figure salary.  He committed these crimes purely because of his greed, not out of any sort of "need" or duress.  Although in Clinic hierarchy, Rizk was subordinate to Fingerhut, Rizk was the mastermind behind this scheme.  He convinced Fingerhut to participate, to their collective benefit and the Clinic's detriment.  In so doing, Rizk violated the Clinic's trust by taking advantage of the oversight responsibilities that the Clinic had entrusted to him – and the fact that it is often difficult for a

large organization to oversee and vet individual transactions – and he involved another person in a position of trust to prevent discovery of the same.

Further, Rizk's multimillion-dollar fraud scheme diverted several million dollars that was to be used for creating innovative health care products to improve patient health care outcomes. He kept the lion's share of the $2.7 million that he stole for himself, and used that money to purchase, among other things, a home in Westlake with a $750K-plus price tag.  He also paid what amounted to over $450K in bribes to Fingerhut to keep quiet about the scheme and permit it to persist.  Moreover, Rizk did not commit his criminal conduct on an isolated occasion, but rather committed a series of fraudulent steps and transactions over a period of several years.  He actively sought ways to cover up his fraud on the front-end, including through the use of a shell company and a nominee owner, and he only ceased his scheme when the Clinic caught and fired him.  He then lied to the FBI – and encouraged Fingerhut to do the same, going as far as creating a false loan document to backstop their lies – before finally accepting responsibility for his actions.[1]

Rizk's actions are balanced somewhat by his lack of a prior criminal history, which would favor a sentence lower in the range, and his agreement to judicial removal from this country, thus reducing the government's burden in removing him itself through administrative proceedings, based on his conviction.  Accordingly, a sentence in the middle of the range would thus reflect the seriousness of Rizk's conduct, promote respect for the law, and deter others from committing similar fraudulent schemes, but also account for his lack of a prior criminal history and his cooperation in his immigration matters.

---

[1]  When FBI Special Agents interviewed Rizk on June 22, 2015, Rizk made several false statements, including claiming that other people owned ISTAR, that other people created the ISTAR invoices to the Clinic, and that he had transferred $350,000 to Fingerhut to repay a loan that Fingerhut had previously made to him, when in fact, this money and more were the kickbacks Rizk paid to Fingerhut for his complicity.

**C.  The Court Should Impose Restitution In The Amount Of $2,784,847, On A Joint And Several Basis With Coconspirator Rizk.**

As part of his plea agreement, Rizk agreed to pay restitution to the victims, pursuant to 18 U.S.C. § 3663A, for the losses caused by his relevant conduct.  Restitution to the victims is also directed by the Guidelines.  *See* U.S.S.G. § 5E1.1.  Although the Clinic paid approximately $5.6 million in connection with the fraudulent ISTAR contracts, and incurred additional costs in investigating Rizk, the government believes that this Court should order restitution in the amount that Rizk and Fingerhut profited from the scheme – $2,784,847.  Therefore, the government requests that this Court order Rizk to pay restitution to the Clinic in the amount of $2,784,847, on a joint and several basis with his coconspirator, Gary Fingerhut, who is already subject to a similar restitution order.

The government notes that, as part of his plea agreement, Rizk agreed to deliver in advance of sentencing a total of $25,000 to be paid toward restitution obligations that the parties anticipated the Court imposing, along with an additional $25,000 on the day of sentencing.  To date, the government is not aware of Rizk depositing either such amount with the Clerk of Courts and thus requests that the Court inquire as to the same.  If Rizk has not yet made such payment, the government requests that the Court order him to deposit such amounts with the Clerk's Office immediately.  In addition, in his plea agreement, Rizk agreed to make or cause to be made the following *additional* restitution payments (over and above the initial $50,000), on the following schedule:  $25,000 within 45 days after sentencing; and upon Rizk reporting to serve the sentence imposed by the Court, the $75,000 cash bond that Rizk previously deposited with the Court will be applied toward his restitution obligation.  (R. 37: Plea Agreement, ¶¶ 26-28, PageID 136-37).  The government asks that the Court include these terms in its restitution order.

Finally, the government requests that, upon submission of proof by Jean Martin, Inc., demonstrating a loss caused to it by Rizk collecting amounts from the Clinic and then failing to pay to Jean Martin the discounted price that it charged ISTAR to perform work on the IVHR contracts, the Court order that Rizk pay such additional restitution to Jean Martin, in the established amount.

Respectfully submitted,

Justin E. Herdman
Acting United States Attorney

By:    s/ Rebecca Lutzko
Rebecca C. Lutzko (OH: 0069288)
Chelsea Rice (OH: 0076905)
Assistant United States Attorneys
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, OH 44113
(216) 622-3888/3752
(216) 522-7358 (facsimile)
Rebecca.Lutzko@usdoj.gov
Chelsea.Rice@usdoj.gov

11

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 11th day of October 2019, a copy of the foregoing Sentencing Memorandum of the United States was filed.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  All other parties will be served by regular U.S. Mail.  Parties may access this filing through the Court's system.

<u>/s/ Rebecca Lutzko</u>
Rebecca Lutzko
Assistant U.S. Attorney